Clifton **THOMAS**, Plaintiff–Appellant,

v.

Donald **GISH**, et al., Defendants–
Appellees.

No. 94–2255.

United States Court of Appeals,
Seventh Circuit.

Argued July 7, 1995.

Decided Aug. 28, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 18, 1995.

---

Robert J. Palmer (argued), May, Oberfell & Lorber, South Bend, IN, for Clifton Thomas.

Susan Frederick Rhodes, Asst. Atty. Gen. (argued), Chicago, IL, Serge J. Adams, Office of Atty. Gen., Springfield, IL, for Donald Gish, Delores McDonald, Medical Technician Rushely, Judy Isreall, Doctor Conklin and John Doe.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

The threshold question concerning this appeal from the dismissal of a prisoner's civil rights suit is whether we have appellate jurisdiction. *Houston v. Lack*, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988), holds that a prisoner who does not have a lawyer is deemed to file his notice of appeal from an adverse judgment when he delivers the notice to the prison authorities. This rule is in recognition of the fact that prisoners do not always have ready access to the U.S. postal system. Prisons have procedures by which a prisoner can deliver a pleading or other legal document for mailing, with the date of delivery being stamped on the letter to provide a definite filing date, but in this case the prisoner merely handed his notice of appeal to a guard two days before the deadline for appealing. The notice was actually mailed three days later—a day after the deadline expired.

*Oliver v. Commissioner of Mass. Dept. of Corrections*, 30 F.3d 270, 272 (1st Cir.1994) (per curiam), intimates without quite holding that to get the benefit of *Houston v. Lack* a prisoner must use the prison's procedure for "legal" mail—he cannot just entrust his letter to a guard—although an alternative interpretation of the opinion is that the prisoner's failure to use the prison's procedure was merely one factor supporting the district judge's finding that the prisoner had not in fact mailed the letter in question. An earlier decision, however, *United States v. Leonard*, 937 F.2d 494 (10th Cir.1991), is unequivocal: the prisoner must use the procedure of "legal mail" in order to take advantage of the rule of *Houston v. Lack*. (*Leonard* involved a federal prisoner, but we cannot see what difference that makes.) So in the Tenth Circuit certainly, and the First Circuit possibly, Thomas's appeal would be dismissed out of hand for his failure to follow the prescribed procedure for mailing "legal" mail. Other circuits take a softer line, however, *Caldwell v. Amend*, 30 F.3d 1199 (9th Cir. 1994); *In re Flanagan*, 999 F.2d 753, 759 (3d Cir.1993); *Garvey v. Vaughn*, 993 F.2d 776

(11th Cir.1993); *Hamm v. Moore*, 984 F.2d 890, 892 (8th Cir.1992); cf. *United States v. Grana*, 864 F.2d 312 (3d Cir.1989), although an earlier decision in the Ninth Circuit, *Miller v. Sumner*, 921 F.2d 202 (9th Cir.1990), relied on in *Leonard*, takes the hard line. Our court has not addressed the issue.

We are not altogether sure what rule emerges from the soft line but maybe it is something like the following: failure to follow the prescribed procedure for "legal" mail shifts the burden of establishing entitlement to the benefits of *Houston v. Lack* to the prisoner, while failure of the prison to have a procedure for logging or date-stamping legal mail shifts back to the prison the burden of showing that the prisoner should not be entitled to the benefits of *Houston's* dispensation.

Whether it is necessary to shift burdens around in this or any other way in order to resolve these cases in a satisfactory fashion may be doubted. A prisoner who hands a letter for mailing to a guard takes a big risk that, if the guard does not mail it promptly, the prisoner will be unable to establish to a court's satisfaction when he gave it to the guard. That probably is sanction enough for failing to use the prison's regular system for the deposit of mail. And, on the other hand, prisons that do not date-stamp legal mail will have a hard time showing that a given piece of such mail was untimely. Prisons that wish to avoid the uncertainty engendered when legal mail is handed to guards rather than deposited in the box designated for such mail can instruct the guards not to accept such mail from prisoners but instead to direct the prisoners to deposit it in the authorized place themselves. Of course this may not work for prisoners who are being confined in disciplinary segregation—which is one reason why the rule intimated in *Oliver* and adopted in *Leonard* case strikes us as too strict, while to have separate rules for segregated and unsegregated prisoners, or for prisoners who cannot and prisoners who can feasibly use the prison's regular mail system, would complicate the principle of *Houston v. Lack* unduly.

Effective December 1, 1993, and therefore applicable to Thomas's appeal, the Federal Rules of Appellate Procedure were amended to provide that a prisoner's notice of appeal, to be timely, must be deposited in the prison's "internal mail system" by the due date. Fed.R.App.P. 4(c). The term is not defined, and so its bearing on the issue that we and the other courts have been wrestling with is unclear. *Miller v. Benson*, 51 F.3d 166, 169 (8th Cir.1995); *Oliver v. Commissioner of Mass. Dept. of Corrections, supra*, 30 F.3d at 272. For all that appears, in Thomas's jail handing a letter to a guard is a proper method of depositing mail in the prison's internal mail system. Compare *Redd v. Gilless*, 857 F.Supp. 601, 605 (W.D.Tenn. 1994). It may be significant that the new rule does not distinguish between "legal" and other mail or require the prisoner to follow the procedure for depositing the former.

The judge in this case found that the prisoner had in fact handed his notice of appeal to the guard within the period for filing the notice. The finding is not clearly erroneous, and we consider ourselves bound by it to conclude that we have jurisdiction. This brings us to the merits of the appeal. The district judge on his own initiative dismissed the suit as barred by res judicata, but before doing so he gave Thomas a chance to explain why the suit should not be dismissed; and Thomas, though handicapped by not being represented by counsel at that point, nevertheless submitted a lengthy explanation.

The facts are straightforward. Back in 1987 Thomas had gotten into a fracas with guards who were trying to hold him down so that a sample of his blood could be taken. Claiming that they used excessive force and as a result injured his back and that the prison failed to treat the injury properly, Thomas in 1989 brought a civil rights suit against various employees of the prison. The district court granted summary judgment for the defendants, finding that Thomas had received competent medical attention and in any event had not had a back injury. It was true that Thomas was using a wheelchair and claimed to be unable to walk. But after careful examination the medical staff concluded that Thomas was faking the injury, that he could walk perfectly well, and that the limp he displayed in attempting to walk

during the examination was "bizarre and clearly fabricated." Thomas did not appeal from that judgment, which was rendered in 1991. According to Thomas's second complaint, the complaint that began the present suit, shortly before the judgment in the first suit the prison authorities took away his wheelchair, refused to give him crutches, and refused to continue feeding him in his cell, instead making him go to the dining room with the other prisoners. The second suit, filed in 1993 and dismissed as we have said as barred by res judicata, claims that these actions aggravated his back injury. The defendants probably are different employees of the prison from those in the first suit, although this is not certain because the record of the first suit is incomplete. What we are calling the second suit—the present suit—is actually Thomas's third growing out of the same fracas. But the first was against a guard who punched Thomas in the face, is not yet resolved, see *Thomas v. Stalter,* 20 F.3d 298 (7th Cir.1994), and is not claimed to have any preclusive effect on the present suit.

The present suit is barred, but not by res judicata, at least in its narrow sense of claim preclusion; rather by collateral estoppel (issue preclusion). The district judge and appellees do not refer to collateral estoppel as such, but the appellees adequately allege the preclusive effect of the finding in the first suit that Thomas did not in fact injure his back in the struggle over the blood sample. Preclusive findings are the domain of collateral estoppel.

The acts of the defendants alleged in the present suit—the taking away of the wheelchair, the refusal to furnish crutches, and the refusal to feed Thomas in his cell—are separate from those alleged in the first suit, occurred after the first suit was brought, and were committed by a different set of defendants. The existence of a tenuous causal link between two claims does not make them the same claim, as would be obvious if Thomas's second suit had been for a battery that injured him only because his back had been weakened years earlier in the incident giving rise to his first suit. *Herrmann v. Cencom Cable Associates, Inc.,* 999 F.2d 223, 226 (7th Cir.1993).

But the court found in the first suit that Thomas did not have a back injury, did not need a wheelchair or crutches, could walk perfectly well—was in short a thorough malingerer. This finding was based on evidence and made in the course of a full and fair adjudication of Thomas's allegations. If the finding was clearly erroneous, Thomas had every incentive to challenge it on appeal. It is true that the district court found that even if Thomas had been injured, he had received competent medical care and therefore could not in any event recover damages for deliberate indifference to his medical needs. He could, however, have recovered damages for an injury to his back caused by the alleged excessive force used to extract the blood sample from him—had he been able to upset the finding that his back had not been injured, a finding eligible for use as collateral estoppel, that is, eligible to be given conclusive weight in a subsequent suit brought by Thomas against the same or different parties. E.g., *Crot v. Byrne,* 957 F.2d 394, 397 (7th Cir.1992).

 So used, the finding dooms Thomas's second suit. If he was not injured—the finding that is collateral estoppel—he didn't need the wheelchair, the crutches, or room service, and therefore the deprivation of these things could not be a form of cruel and unusual punishment, as claimed. At argument Thomas's able counsel suggested that even if Thomas had lied about the incident in 1987, four years in a wheelchair might have caused his back and leg muscles to atrophy, so that by 1991 he really needed a wheelchair (or at least crutches) and cell service. That would be an exotic theory of liability—a cousin to a prisoner's refusing medical treatment and then complaining that the prison had exhibited deliberate indifference to his medical needs by failing to treat him—and one perhaps vulnerable to a defense of crying wolf. In any event, the theory is not presented in the brief, and it is therefore waived. The suit is barred by the collateral estoppel component of res judicata.

AFFIRMED.